UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

ANDREA N. DUNCAN,

                                     Case No. 13-12047

             Plaintiff,

                                     Paul D. Borman
v.                                    United States District Judge


COMMISSIONER OF
SOCIAL SECURITY,

                         Defendant.
_____/

## OPINION AND ORDER
## (1) DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT (ECF NO. 16); (2) GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT (ECF NO. 22); AND (3) AFFIRMING THE COMMISSIONER'S DECISION

Plaintiff Andrea N. Duncan brings this action pursuant to 42 U.S.C. § 405(g), challenging the final decision of Defendant Commissioner of Social Security ("Commissioner") that denied both her application for disability insurance benefits and also her application for supplemental security income pursuant to the Social Security Act (the "Act"). Plaintiff requests that if the court is unable to grant a favorable decision based on the records in the administrative transcript that the Court grant a Sentence Six remand for review of the additional information submitted. See 42 U.S.C. § 405(g). The parties have filed cross-motions for summary judgment. (ECF Nos. 16, 22).

For the reasons set forth below, the Court finds that there is no reason for a Sentence Six remand and finds that the Administrative Law Judge's ("ALJ") conclusion that Plaintiff is not disabled under the Act is supported by substantial evidence and was made pursuant to the proper

legal standards. Therefore, the Court will deny the Plaintiff's motion for summary judgment, grant the Commissioner's motion for summary judgment, and affirm the Commissioner's decision.

## I. BACKGROUND

A.    Procedural History

Plaintiff filed her applications for supplemental social security income and disability insurance benefits on August 30, 2010. (Tr. 14, 148, 168). Plaintiff claimed disability based on degenerative arthritis of the knee, methicillin-resistant staphylococcus ("MRSA"), esophagitis and gastro esophageal reflux disease ("GERD"), and obesity. (Tr. 77). Plaintiff alleged a disability onset date of August 26, 2010 in both of her applications. (Tr. 146, 168). These claims were initially denied on December 1, 2010 (Tr. 14) and Plaintiff requested a hearing (Tr. 106-07). On November 15, 2011, Administrative Law Judge ("ALJ") David Skidmore held a hearing during which Plaintiff appeared and testified. (Tr. 30-76). Plaintiff was represented by an attorney at the hearing, and a vocational expert, Leonard M. Fisher, also appeared and testified. (Tr. 62-75).

On December 22, 2011, ALJ Skidmore issued his decision and found Plaintiff was not disabled under the Act because she retained the functional capacity to perform work at the sedentary level and there were numerous such jobs that existed in the economy. (Tr. 14-24). This decision became the Commissioner's final decision when the Appeals Council declined Plaintiff's request for review on March 15, 2013. (Tr. 1-4). Plaintiff then filed the present action with this Court on May 8, 2013. (ECF No. 1, Compl.).

B.      Hearing Testimony

Plaintiff's attorney noted during the hearing that Plaintiff had limited access to medical care due to her Medicaid insurance coverage that limited her treatment options and did not cover physical therapy.  (Tr. 34-35).  Plaintiff testified that at the time of the hearing she was 31, and that she was 5' 10" inches tall and weighed 308 pounds.  (Tr. 35-36).  Plaintiff also explained that her weight had increased over the last few years because she was unable to exercise due to her knee pain.  (Tr. 35-36).  Plaintiff lived at her parents' house and did not drive because she did not have a valid license due to prior convictions for "a couple of DUIs".  (Tr. 36).

Plaintiff completed a year or so of college and also had her high school diploma.  (Tr. 37).  Plaintiff testified that she last worked in 2007 for an adult foster home.  (*Id*.).  She was fired from that job because she was chronically late in part because of her heartburn.  (*Id*.).

Plaintiff testified she has suffered from knee problems since she was a child and had surgery on her right knee when she was 10 years old.  (Tr. 37-38).   Plaintiff described her pain as located in her lower back and her knees.  (Tr. 38).  Plaintiff explained she began receiving medical care for her knee pain in 2010 because that is when she obtained insurance.  (Tr. 39).  Plaintiff testified that her prescription medication for her knee pain "helps".  (*Id*.).  Plaintiff testified that she did not need a cane to walk.  (Tr. 43).

Plaintiff testified that she could walk for five minutes and that she could lift five to ten pounds on a regular basis.  (Tr. 40-41).  She also described that she sometimes had pain in her fingers and wrists but that she could screw in a lightbulb.  (Tr. 41).

Plaintiff was able to do light laundry and fold clothes but did not do any cooking or other housework.  (Tr. 42).  Plaintiff also did not have problems with her personal hygiene.  (*Id*.).  As

3

for social activities, Plaintiff explained that approximately twice a weekend she would go to friends' houses to watch movies. (Tr. 43). Plaintiff testified that she rested often during the day due to her pain, but for a period of time she also cared for her niece with the help of a friend. (Tr. 42, 50-51). Plaintiff further testified that her pain level was high, generally an eight on a scale of ten, but her medication helped as well as elevating her legs. (Tr. 47-48). She also had problems sleeping due to pain and is usually fatigued. (Tr. 57). Her concentration was also affected by her prescribed medications of Nexium, Carvedilol, Hydrocodone, and Tramadol. (Tr. 39).

Plaintiff also explained that she suffered from GERD which caused her to feel like she was going to throw up and interrupted her sleep. (Tr. 54). However, Plaintiff testified that she was now on medication and that helped with her symptoms. (*Id*.).

Plaintiff further testified that she suffered from dizzy spells and feeling faint and that her doctor believed that it was related to her blood sugar. (Tr. 55). Plaintiff also noted that her white blood cell count had been elevated at times in the past and she was referred to a hematologist, but no cause for the elevated white blood cell count had been determined. (*Id*.).

C.    Medical Evidence

Plaintiff has a history of knee problems dating back to when she was a child, when she had surgery on her right knee. (Tr. 19, 37, 269, 271). Plaintiff was first seen for knee pain on July 22, 210 by Autumn Hopkins, a certified physician's assistant who noted Plaintiff's chief complaint as "life-long bilateral knee pain", but also noted that Plaintiff was in "no acute distress", had no recent injuries to the knee, described the knees as symmetrical, found there was no significant laxity in either joint, no swelling or redness, but observed that her knees

4

"crack[ed] and creak[ed]" when she walked, and Plaintiff had a "fair amount of crepitus with

extending and flexing".  (Tr. 229).  Hopkins further noted that because "her pain with

weightbearing and exercise she has been gaining weight, which also contributes to the knee

pain." (*Id*.).  Hopkins also noted Plaintiff is "obese with a BMI of 46".  (*Id*.).  Hopkins advised

Plaintiff that her options for specialists were limited given that she was on Medicaid.  (*Id*.).

Also in July 2010, because of Plaintiff's history of heartburn and dypepsia, Plaintiff had

an esophagogastroduodenscopy with biopsy that showed no significant histopathalogic changes.

(Tr. 17, 230-31; 236-37).  Plaintiff was prescribed Nexium which improved her symptoms.  (Tr.

17, 247).

Then in August 2010, Plaintiff had an MRI on her right knee that showed "extensive high

grade and full thickness chondral loss over the medial patellar ridge and lateral patellar facet."

(Tr. 232-33).  There was also "mild to moderate osteophytosis and mild lateral patellar

subluxation and tilt" and evidence of loose bodies.  (*Id*.).  These findings were consistent with

"[m]arked extensive subchondral bone plate and articular irregularity over the slightly posterior

portion of the weight bearing lateral femoral condyle may be on the basis of old osteochondral

injury" and "multiple loose intraarticular bodies".  (*Id*. at 233).

On August 26, 2010, Plaintiff was seen by Dr. Robert Schaefer, an orthopedist specialist.

(Tr. 269-70).  Dr. Schaefer noted that Plaintiff was 5' 11" and 297 pounds and had full range of

motion in her knees but found there was "marked crepitation, especially of the right knee, but

present bilaterally involving the patellofemoral joint."  (Tr. 269).  Dr. Schaefer diagnosed her

with "osteoarthritis of the knees, right much more symptomatic than the left, rule out

degenerative menisucus tear" and noted that he had not yet reviewed her MRI results.  (*Id*.).  Dr.

Schaefer opined that he believed that Plaintiff should try a local injection into the knee joint for short-term relief of her symptoms. (Tr. 270). Dr. Schaefer also discussed the possibility of an arthroscopic debridement of the right knee joint and noted he would be checking into her insurance coverage for such an intervention. (*Id.*). Plaintiff was also prescribed Mobic and omeprazole. (*Id.*). However, it appears that Plaintiff was unable to fill her prescription for omeprazole because of lack of insurance coverage. (Tr. 269).

On September 21, 2010, Plaintiff was seen by Hopkins for unrelated pain in her right breast and also complained of her continued weight gain and her hypertension. (Tr. 252). Plaintiff's weight was measured at 303 pounds and her blood pressure was noted at 140/76. (*Id.*). Hopkins gave Plaintiff "information on weight management with emphasis on calorie restriction because her activity is limited right now" and noted that Plaintiff "understands that weight loss is going to be crucial for her pain control and her joints". (*Id.*). Hopkins also noted that she would request records from Dr. Schaefer for "follow up on the plan of care for her knee". (*Id.*).

In November 5, 2010, Plaintiff was evaluated by a state medical consultant, Dr. R. Scott Lazarra, M.D. (Tr. 244-51). Dr. Lazarra found that there was "synovial thickening at the bilateral knees", "crepitance at the anterior compartment bilaterally", and "a 20 degree valgus deformity at the right knee." (Tr. 248). Her grip strength was intact and her dexterity was not impaired. (*Id.*). Dr. Lazarra also noted that Plaintiff had no difficulties with getting on and off the examination table, or heel and toe walking, and Plaintiff only had mild difficulty with squatting and hopping. (*Id.*). Plaintiff's weight was 300 pounds and her blood pressure was 124/90. (*Id.*).

6

Dr. Lazarra also reviewed Plaintiff's MRI studies from August 2010 and noted that those reflected "some chondral loss at the medial patellar ridge with moderate osteophytes." (Tr. 251). Further, noted was that Plaintiff had "crepitance and synovial thickening in this area. (Tr. 251). She but only had "mild difficulty squatting and hopping." (*Id.*). Dr. Lazarra also observed Plaintiff had a "wide based gait" that was due to "her body habitus" but did not need the use of an assist device to walk. (Tr. 250-51). Dr. Lazarra found that she had "a mild valgus deformity in the right knee." (Tr. 251). Dr. Lazarra concluded that Plaintiff to be "somewhat stable" because she was undergoing injection treatments and taking anti-inflammatories but also noted that she would "benefit from weight reduction as she is at her maximum weight of 300 pounds." (*Id.*).

Relevant to Plaintiff's MRSA diagnosis, Dr. Lazarra found that Plaintiff had no active skin lesions, was not on antibiotic therapy, and was "compliant in regards to monitoring this and seeking treatment as needed." (*Id.*).

On July 1, 2011, Plaintiff was seen by Hopkins and complained of feeling dizzy and "fuzzy". (Tr. 280-81). Hopkins documented Plaintiff's blood pressure at 140/88 and her weight at 313 pounds. (Tr. 280). Plaintiff advised Hopkins that she had believed her blood sugar was low and tried eating sugary foods. (*Id.*). Hopkins again noted that Plaintiff was "obese" and that Plaintiff reported no back pain, but a pain level of 8 related to her knees. (*Id.*). Hopkins ordered blood tests in regards to Plaintiff's dizzy spell which showed a high white cell blood count. (Tr. 280-81, 284). Plaintiff was then referred to a hematologist. (Tr. 281).

Later notes indicate that Plaintiff reported that she had seen a hematologist and had a bone marrow biopsy. (Tr. 284).

7

In August 2011, Plaintiff was seen by Tracy Smith, a certified physician's assistant in Dr. Schaefer's practice. (Tr. 267). Plaintiff's weight was noted to be 309 pounds, and her blood pressure was 132/98. (*Id.*). Smith documented that Plaintiff was suffering from bilateral knee pain that was worse in the right knee. Plaintiff described the pain as "dull and achy in nature at rest, sharp, shooting with activities, worse with bending, squatting, kneeling, climbing up and down stairs". (*Id.*). Smith found that Plaintiff had no anterior laxity with Lachman or anterior drawer, Plaintiff also presented "negative valgus and varus stress", and she had a normal range of motion, but "patellofemoral crepitus was noted throughout the range of motion." (*Id.*). Plaintiff denied that she had any locking or episodes of instability. (*Id.*).

Smith opined that Plaintiff was continuing to suffer from bilateral knee pain secondary to osteoarthritic changes with the right knee being more symptomatic than left. (*Id.*). Smith documented Plaintiff's limited insurance coverage under the Adult Benefit Waiver and advised her that she might be approved for "viscous supplementation injections" or an "arthroscopic debridement and lateral retinacular release as well as chondroplasty". (Tr. 267-68). Smith opined that if Plaintiff was approved for the injections, then Plaintiff would receive those first before seeking approval for surgery. (*Id.*).

On October 14, 2011, Plaintiff visited Hopkins and complained of a headache and feeling dizzy and faint, including breaking out in a cold sweat. (Tr. 279). Plaintiff also indicated she had back pain. Her blood pressure was measured at 130/92 and her weight was documented at 308 pounds, and she indicated a pain level of 9 out of ten. (*Id.*). Hopkins ordered a CT scan, and blood work. (*Id.*).

8

Then in November 2, 2011, Plaintiff presented to Hopkins for a two week follow up. (Tr. 277). Plaintiff was in "no acute distress" and Hopkins noted that a previous CT scan was normal. (*Id*.). Plaintiff advised that she was feeling a bit better. (*Id*.). Plaintiff had a previous fasting glucose test that was normal and Hopkins also checked her sugar during the office visit which was also normal. Hopkins noted that Plaintiff had high blood pressure but no exact reading was recorded. (*Id*.). Hopkins also discussed "the importance of lifestyle changes" with Plaintiff and advised her that losing weight was imperative "for her joint pain and back pain" and recommended aquatic therapy. (*Id*.). Hopkins opined that she believed Plaintiff's dizzy spells were related to blood sugar fluctuations and advised Plaintiff on "eating more routine healthy three meals a day" to help with the issue. (*Id*.). Plaintiff was also advised to quit smoking. (*Id*.).

Hopkins also completed a medical source statement for Plaintiff on November 11, 2011. (Tr. 262-66). Hopkins provided that Plaintiff could walk zero city blocks, could sit for fifteen minutes at a time and only stand for five to ten minutes at a time. (Tr. 263). Hopkins also opined that Plaintiff could sit and stand/walk for less than two hours total in an eight-hour working day and would need a job that would allow her to shift position at will, but did not need the option to walk around during an eight-hour day. (Tr. 263-64). Plaintiff also needed unscheduled breaks every hour due to pain, medication side effects, and muscle weakness. (Tr. 264). However, Hopkins found that Plaintiff did not need to elevate her legs nor did Plaintiff require a cane or other hand-held assistive device to walk or stand. (*Id*.). As to postural limitations, Hopkins found that Plaintiff should never stoop or climb ladders, and should rarely twist, crouch, or climb stairs. (Tr. 265). Hopkins found that Plaintiff had limitations on her hand/fingering and arms, and concluded that Plaintiff could only spend 20% of an eight hour day

9

reaching, fingering or grasping and turning objects. (*Id*.). Hopkins also believed Plaintiff would be off-task for 25% of the day and was incapable of even "low stress" work. (*Id*.).

D.     Vocational Expert's Testimony

The ALJ posed a hypothetical to the Vocational Expert ("VE"), Dr. Leonard M. Fisher, regarding an individual of the same age, education, and work experience of Plaintiff who was limited to sedentary work and who was limited to lifting ten pounds occasionally, lighter weights more frequently, could stand and walk for about two hours and sit for up to six hours during an eight hour shift with regular breaks, and who could never climb ladders, ropes, or scaffolds, but could occasionally climb cramps or stairs, as well as balance, stoop, kneel, crouch and crawl occasionally. Such a person could never be exposed to extreme cold or heat, wetness or unprotected heights, moving machinery, or hazardous machinery. Further, the ALJ instructed the VE that such a hypothetical person need a sit/stand option such that she was permitted to do so once or twice a hour for five minutes. The hypothetical person would also be limited to simple, routine, repetitive tasks, where she could understand, remember, ask and carry out simple work instructions, but would be unable to perform more complex decision making and could tolerate only occasional changes in work settings. (Tr. 63-67).

The VE testified that such a hypothetical individual would be unable to perform Plaintiff's past relevant work but would be able to perform the requirements of representative unskilled, sedentary occupations such as a charge account clerk (approximately 5,600 jobs exist in the region and 216,000 jobs exist nationally), or a touch-up screener, printed circuit board assembly worker (19,271 jobs exist in the region and 300,000 to 400,000 jobs exist nationally). (Tr. 66-67).

10

## II. STANDARD OF REVIEW AND LEGAL FRAMEWORK

"In Social Security cases, the Commissioner determines whether a claimant is disabled within the meaning of the Act and therefore entitled to benefits." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (citing 42 U.S.C. § 405(h)). This Court has original jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. § 405(g). However, the Court's review under this statute is limited to determining whether those findings are supported by substantial evidence and made pursuant to proper legal standards. *See* 42 U.S.C. § 405(g) ("The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive ... "); *Cutlip v. Sec't of Health and Human Servs.*, 25 F.3d 284, 286 (1994) ("Judicial review of the Secretary's decisions is limited to determining whether the Secretary's findings are supported by substantial evidence and whether the Secretary employed the proper legal standards."). Substantial evidence is "'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Kyle v. Comm'r of Soc. Sec.*, 609 F.3d 847, 854 (6th Cir. 2010) (quoting *Lindsley v. Comm'r of Soc. Sec.*, 560 F.3d 601, 604 (6th Cir. 2009)); *see also McGlothin v. Comm'r of Soc. Sec.*, 299 F. App'x 516, 522 (6th Cir. 2008) (recognizing that substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.") (internal quotations omitted). "If the Commissioner's decision is supported by substantial evidence, we must defer to that decision, 'even if there is substantial evidence in the record that would have supported an opposite conclusion.'" *Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007) (quoting *Longworth v. Comm'r of Soc. Sec. Admin.*, 402 F.3d 591, 595 (6th Cir. 2005)).

11

This Court does not "try the case de novo, nor resolve conflicts in the evidence, nor decide questions of credibility." *Cutlip*, 25 F.3d at 286.  Indeed, "[I]t is of course for the ALJ, and not the reviewing court, to evaluate the credibility of witnesses, including that of the claimant." *Rogers*, 486 F.3d at 247; *see Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 542 (6th Cir. 2007) (providing that the "ALJ's credibility determinations about the claimant are to be given great weight, 'particularly since the ALJ is charged with observing the claimant's demeanor and credibility.") (citation omitted)).

Under the Act, Disability Insurance Benefits (for those qualifying wage earners who become disabled prior to the expiration of their insured status) and Supplemental Security Income "are available only for those who have a 'disability.'" *See Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007).  "[D]isability" is defined in the Act, as the: "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A) (DIB); 20 C.F.R. § 416.905(a) (SSI).[1]

The Commissioner's regulations provide that disability is to be determined through the application of a five-step sequential analysis:

> Step One: If the claimant is currently engaged in substantial gainful activity, benefits are denied without further analysis.

> Step Two: If the claimant does not have a severe impairment or combination of

---

[1] The Court notes that the regulations governing the disability determinations under Titles II and XVI of the Social Security Act are identical in all relevant respects and therefore the Court shall only refer to the Title II regulations, found at 20 C.F.R. § 404.15xx. The corresponding Title XVI regulations are found at 20 C.F.R. § 416.9xx.

impairments that "significantly limits ... physical or mental ability to do basic work activities," benefits are denied without further analysis.

Step Three: If the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the severe impairment meets or equals one of the impairments listed in the regulations, the claimant is conclusively presumed to be disabled regardless of age, education, or work experience.

Step Four: If the claimant is able to perform his or her past relevant work, benefits are denied without further analysis.

Step Five: Even if the claimant is unable to perform his or her past relevant work, if other work exists in the national economy that plaintiff can perform, in view of his or her age, education, and work experience, benefits are denied.

*See* 20 C.F.R. §§ 404.1520, 416.920; *see also Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001). "The burden of proof is on the claimant throughout the first four steps . . . . If the analysis reaches the fifth step without a finding that the claimant is not disabled, the burden transfers to the [Commissioner]." *Preslar v. Sec'y of Health & Human Servs.*, 14 F.3d 1107, 1110 (6th Cir. 1994).

A.     ALJ's Application of Legal Framework

At step one, the ALJ determined that Plaintiff met the insured status requirements of the Act through June 30, 2012 and had not engaged in substantial gainful activity since August 26, 2010 (the alleged onset date). (Tr. 16). At step two, he found that Plaintiff suffered from the severe impairments of degenerative arthritis of the knees bilaterally and obesity. (*Id.*).

The ALJ also determined at step two that Plaintiff had a number of other "non-severe" conditions. (Tr. 16-17). First, the ALJ found that Plaintiff's hypertension was controlled with medication and therefore was considered a non-severe impairment. (Tr. 16-17). The ALJ also determined that Plaintiff's esophagitis and gastro esophageal reflux disease (GERD) were also

13

non-severe impairments because Plaintiff's 2010 esophagogastroduodenoscopy with biopsy showed no histopathalogic changes, and her use of Nexium improved her symptoms. Additionally, the progress notes indicated that Plaintiff was "symptom free".  (Tr. 17).

Next, the ALJ found that Plaintiff's history of methicillin-resistant staphylococcus (MRSA) was a non-severe impairment under the regulations because she did not require medication at that time, had no active skin lesions, reported no serious effects such as sepsis or organ failure, did not allege disability based on MRSA at the hearing, and such a history did not "more than minimally limit the claimant's ability to perform basic work activity".  (*Id.*).

The ALJ also found that Plaintiff's alleged back impairment was a non-severe impairment because "[n]o medical treatment or follow up has been documented" and she had never reported any back pain to her treating orthopedist, Robert Schaefer, M.D.  (*Id.*).

The ALJ next determined that Plaintiff's alleged depression was considered a "non-medically determinable impairment" because there was "no evidence in the file which suggest[ed] depressive symptoms or document[ed] any limitation due to depression" and Plaintiff did not take any medication, had never been hospitalized or had any emergency intervention for such a condition.  (*Id.*).

Finally, the ALJ noted that some of Plaintiff's alleged impairments were not discussed in detail because of "the lack of supporting objective medical evidence and/or their minimal impact on the claimant's ability to do basic work related activities" and as a result those impairments were considered non-severe.  However, the ALJ did note that even considering those impairments as "severe" would not have resulted in greater limitations than those set forth in his residual functional capacity assessment.  (Tr. 17-18).

14

Given these facts and conclusions, the ALJ found at step three that Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments. (Tr. 18). Specifically, the ALJ determined the Plaintiff "demonstrated the ability to ambulate effectively without the use of an assistive device" in November 2010 and therefore did not meet the criteria of listing 1.02 (major dysfunction of a joint). (*Id.*).

Because the ALJ determined that Plaintiff did not have a listed impairment, he went on to ascertain her residual functional capacity. (Tr. 18-22). At steps four and five of the analysis, the ALJ concluded that Plaintiff was unable to perform any of her past relevant work and had the residual functional capacity to perform sedentary work "with some postural and environmental limitations, and a limited sit/stand option." (Tr. 19). Specifically, the ALJ found that Plaintiff had the residual functional capacity to:

> lift and/or carry 10 pounds occasionally and nominal weight frequently; stand and/or walk about 2 hours in an 8 hour work day; and sit about 6 hours in an 8 hour work day, with normal breaks. The claimant must be allowed a sit/stand option that allows her to stand 1 to 2 times an hour for 5 minutes each time, without abandoning her work. The claimant can occasionally balance, stoop, kneel, crouch, crawl, and climb ramps or stairs; but cannot climb ladders, ropes or scaffolds. The claimant must avoid concentrated exposure to extreme cold, extreme heat and wetness; and all exposure to unprotected heights and hazardous, moving machinery. Given the concentration deficits secondary to knee pain, the claimant would be limited to simple, routine repetitive tasks. She is able to understand, remember and carry out simple work instructions, but is unable to perform more complex decision-making that would require creative solutions to novel situations; and is limited to no more than occasional changes in the work setting, in terms of work process and procedures.

(Tr. 18).

Then, considering Plaintiff's age, education, work experience, and residual functional capacity, the ALJ found that jobs existed in significant numbers in the national economy that Plaintiff could perform. (Tr. 22-23). The ALJ relied upon the testimony of the VE, who found

15

that a worker of Plaintiff's age, education, work experience and who was subject to the same

functional limitations would be able to perform "the requirements of representative unskilled,

sedentary occupations such as charge account clerk []; and touch-up screener, printed circuit

board assembly..." (Tr. 23). Accordingly, the ALJ found that Plaintiff had not been under a

disability, as defined by the Act, from August 26, 2010 through December 11, 2011. (*Id*.).

### III. ANALYSIS

A.      Sentence Six Remand

Plaintiff argues that certain evidence was improperly returned by the Appeals Council

and not made part of the record. The Court notes that it is immaterial whether the Appeals

Council considered Plaintiff's "new" evidence or made it part of its record because "evidence

submitted to the Appeals Council after the ALJ's decision cannot be considered part of the

record for purposes of substantial evidence review." *Foster v. Halter*, 279 F.3d 348, 357 (6th

Cir. 2001) (citing *Cline v. Comm'r of Soc. Sec*., 96 F.3d 146, 148 (6th Cir. 1996) (noting

parenthetically that "where the Appeals Council considers new evidence but declines to review a

claimant's applications for disability insurance benefits on the merits, the district court cannot

consider that new evidence in deciding whether to uphold, modify, or reverse the ALJ's

decision."). In the present case, the Appeals Council apparently did not consider Plaintiff's

newly submitted evidence and also declined to review her case on the merits. Regardless, this

Court's "substantial-evidence review of the ALJ's decision does not consider new evidence

submitted after that decision is rendered." *Lee v. Comm'r of Soc. Sec*., 529 F. App'x 706, 717

(6th Cir. 2013) (citing *Foster*, 279 F.3d at 357). Therefore, to the extent Plaintiff argues an error

based on the exclusion of certain evidence from the administrative record presented to the

Appeals Council, the argument is without merit when this Court cannot consider any evidence that was not before the ALJ.

Plaintiff also requests that this Court remand this action pursuant to Sentence Six of 42 U.S.C. 405(g).  A remand pursuant to Sentence Six allows a district court to remand a case "for further administrative proceedings in light of the evidence, if a claimant shows that the evidence is new and material, and that there was good cause for not presenting it in the prior proceeding." *Foster*, 279 F.3d at 357.  The plaintiff bears the burden to establish all three requirements.  *Id*. Evidence is considered "new" only if it was "not in existence or available to the claimant at the time of the administrative proceeding."  *Id*. (citing *Sullivan v. Finkelstein*, 496 U.S. 617, 626 (1990)).  The evidence is considered "material" only when there is "a reasonable probability that the Secretary would have reached a different disposition of the disability claim if presented with the new evidence."  *Id*. (citation omitted).  Finally, a plaintiff can show "good cause" by demonstrating "a reasonable justification for the failure to acquire and present the evidence for inclusion in the hearing before the ALJ."  *Id*. (citation omitted).

In the instant case Plaintiff asserts that this action should be remanded to the ALJ pursuant to Sentence Six based on records from Borgess Medical Center dated October 25, 2002 (ECF No. 16, Pl.'s Br., Ex. 1) and additional medical records from Plaintiff's treating orthopedist, Robert Schaefer, M.D. dated July 24, 2012 through September 5, 2012 (ECF No. 21, Pl.'s Addendum, referred to as "Ex. 2").

As an initial matter, the Court notes that the medical evidence from 2002 is not "new" evidence and Plaintiff has failed to articulate "good cause" as to why such evidence was not previously submitted to the ALJ.  Regardless, such evidence is not "material" to this action

17

where the evidence merely corroborates that Plaintiff underwent a knee surgery when she was nine. The ALJ explicitly noted that fact in his decision and Plaintiff testified to the same during the hearing. (Tr. 19, 37-38). Therefore, Plaintiff cannot show that the ALJ would have reached a different disposition if he had considered this 2002 evidence. Accordingly, a Sentence Six remand based on the 2002 medical evidence is denied.

As to the 2012 medical records from Dr. Schaefer, the Court similarly finds that Plaintiff cannot meet her burden for a Sentence Six remand. The 2012 records include evidence that she had an elective right knee arthoscopic debridement in August 2012, and an application for a disability parking placard indicating that Plaintiff had a "temporary" condition that required her to use an ambulatory aid in July 2012. (Addendum, Ex. 2). Plaintiff claims that the 2012 medical records are "new" because those records did not exist at the time of the November 2011 administrative hearing. It appears that Plaintiff contends that good cause exists for her failure to obtain this evidence because her condition worsened, hence her need for knee surgery eight months after the ALJ's decision. Plaintiff further argues that medical evidence is "material" because it supports Autumn Hopkins' earlier November 2011 RFC assessment. (Tr. 262-66).

The Court finds that while Plaintiff's evidence does suggest that her condition has continued to worsen since the November 2011 hearing, the new medical evidence is not relevant to her condition as of November 2011. *See Oliver v. Sec'y of Health and Human Servs.*, 804 F.2d 964, 966 (6th Cir. 1986) ("[c]laimant argues that the evidence shows his condition has worsened since the Secretary's decision was made. While this may be true, it does not affect the Secretary's 1983 decision."); *see also Wyatt v. Sec'y of Health and Hum. Servs.*, 974 F.2d 680, 685 (6th Cir. 1992) ("Evidence of a subsequent deterioration or change in condition after the

18

administrative hearing is deemed immaterial."). Indeed, where a claimant's condition has worsened, the proper remedy is to initiate a new claim for benefits rather than seek a Sentence Six remand. *See Sizemore v. Sec'y of Health & Human Servs*., 825 F.2d 709, 712 (6th Cir. 1988). This is especially relevant where Plaintiff appears to claim that her need for a temporary ambulatory device in July 2012, around the time of her knee surgery, would have affected the ALJ's determination that she did not need nor had ever been prescribed such a device as of November 2011. (*See* Tr. 42, Plaintiff testifying that she did not need to use a cane or ambulatory aid to walk).

Further, Plaintiff appears to argue that Hopkins' November 2011 assessment was supported by the 2012 medical evidence and the ALJ would have given more weight to Hopkins' less than sedentary assessment if he reviewed that new evidence. First, the Court notes that the ALJ gave little weight to Hopkins' less than sedentary assessment in November 2011 finding that it was at odds with the Dr. Schaefer's August 2010 assessment wherein he did not submit that Plaintiff was subject to any limitations and outlined conservative treatment. (Tr. 20). The ALJ also found that Hopkins' assessment conflicted with Dr. Lazzara's November 2010 assessment, and noted that Plaintiff failed to report any problems with her upper extremities. (Tr. 20).

Significantly, the ALJ noted in his decision that as of August 2011 Tracy Smith, a physician's assistant in Dr. Schaefer's practice, was looking into trying to "obtain authorization for either viscous supplementation injections; or arthroscopic debridement, lateral retinacular release and chondroplasty." (*Id*.). If approval for the injections was denied, Smith noted she

19

would "check with Medicaid to see if the claimant qualified for surgical intervention."[2]  (Tr. 20).

The ALJ's acknowledgment of these facts undermines any argument that the "new" evidence

(showing that one year later Dr. Schaefer did in fact perform an arthroscopic debridement

surgery) would have likely resulted in a different disposition of Plaintiff's disability claim and/or

the ALJ's treatment of Hopkins' 2011 assessment.  Therefore, a Sentence Six remand based on

the 2012 medical records is denied.

Finally, Plaintiff argues generally that this newly submitted evidence supports that she

suffered from "hypertension [and] staph infection residuals".  (Pl.'s Br. at 11).  The Court notes

that none of the newly submitted evidence concerns or documents symptoms related to

Plaintiff's hypertension or staph infection residuals.  Therefore, Plaintiff's request for a Sentence

Six remand based on such an argument is denied.

B.    GERD, MRSA, and Hypertension

Plaintiff argues that the ALJ erred in classifying GERD, MRSA, and hypertension as

"non-severe" impairments and also argues that other conditions such as her dizziness were not

addressed specifically.

The Court finds that Plaintiff's argument is unavailing.  "Under the regulations, once the

ALJ determines that a claimant has at least one severe impairment, the ALJ must consider all

impairments, severe and non-severe, in the remaining steps."  *Pompa v. Comm'r of Soc. Sec.*, 73

F. App'x 801, 803 (6th Cir. 2003) (citing 20 C.F.R. § 404.1545(e)).  In the instant case, the ALJ

identified degenerative arthritis of the knees bilaterally and obesity as severe impairments.  (Tr.

---

[2] The Court notes that the ALJ mistakenly attributed the notes of Tracy Smith from Dr. Schaefer's practice to Dr. Schaefer himself.  However, Plaintiff has not claimed any error and it appears to be a simple oversight.

16).  The ALJ also "considered all impairments, both severe and non-severe, when making this determination".  (Tr. 18).  Therefore, whether the ALJ classified certain impairments as "non-severe" rather than "severe" is "of little consequence."  *Pompa*, 73 F. App'x at 803; *see also Maziarz v. Sec'y of Health & Human Servs*., 837 F.2d 240, 244 (6th Cir. 1987) (finding that the failure to find an impairment was "severe" could not constitute reversible error when another impairment was found to be severe).

Moreover, Plaintiff's argument fails where she has provided no analysis or relevant reference to the medical record to support her contention that her GERD, MRSA and hypertension posed "more than just a 'slight abnormality,' and would have more than just a minimal effect on Andrea's ability to work".  (Pl.'s Br. at 13).  The ALJ, on the other hand, set forth ample evidence that each of the aforementioned impairments was "non-severe" in nature because: (1) GERD: Plaintiff was symptom free and did not allege she had a disability due to such an impairment at the hearing; (2) MRSA: Plaintiff did not have active skin lesions, did not currently require medication, and denied she suffered from "sepsis, multi-function organ failure or hospitalizations"; (3) hypertension: Plaintiff was prescribed medication and there was no record of any doctor having documented any symptoms or limitations due to the condition.[3]  (Tr. 16-17).  Given this record which is undisturbed by Plaintiff, the Court finds that the ALJ's determination that Plaintiff's GERD, MRSA and hypertension were non-severe impairments

---

[3] The Court also notes that Plaintiff argues that her hypertension resulted "in headaches, dizziness and faint feelings".  (Pl.'s Br. at 13).  Plaintiff makes this assertion with no citation to the medical record.  Further, Autumn Hopkins believed as of November 2, 2011 that the dizzy spells were most likely related to "fluctuations in blood sugar".  (Tr. 277).  Plaintiff also testified during the hearing that her blood sugar was being monitored for this reason.  (Tr. 54-55).  Accordingly, the Court finds that Plaintiff has failed to establish that her hypertension is related to her dizziness or faint feelings.

were supported by substantial evidence.

C.    Medical Listing Analysis

At step three, the ALJ concluded that Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of Medical Listing 1.02, relating to the major dysfunction of a joint.  (Tr. 18).  The ALJ noted that to meet or equal the criteria of Listing 1.02 required a finding of gross anatomical deformity resulting in the inability to ambulate effectively.  (*Id.*); *see also* 20 C.F.R. pt. 404, subpt. P, app. 1.  The ALJ determined that because Plaintiff "demonstrated the ability to ambulate effectively without the use of an assistive device" the criteria of Listing 1.02 had not been met.  (Tr. 18).

Plaintiff now argues that this determination was not supported by substantial evidence based on her new evidence that was not before the ALJ in 2011.  Specifically, Plaintiff argues that the criteria of Listing 1.02 have been met or equaled because in July, 2012, Dr. Schaefer noted in an application for a disability placard that she had the need to "use a wheelchair, walker, crutch, brace or other ambulatory aid to walk."  (Addendum, Ex. 2).

The Court finds that Plaintiff's argument is based solely on new evidence that this Court cannot properly consider.  *See Foster v. Halter*, 279 F.3d at 357.  Further, as stated previously, such evidence of Plaintiff's "temporary" need of an ambulatory device in July 2012 is not relevant to the ALJ's finding that she did not need the same in November 2011.  Additionally, the ALJ noted that there was nothing in the medical record that indicated Plaintiff required such an aid.  (Tr. 18).  Moreover, even Hopkins' November 2011 assessment provided that Plaintiff did not need to use a cane or other device to walk.  (Tr. 19, 264).

Accordingly, the Court finds that the ALJ's listings analysis was supported by substantial evidence.

D.      Evaluation of Obesity

Plaintiff next argues that the ALJ did not properly analyze or consider her obesity because he "did not perform the necessary analysis under SSR 02-1p". (Pl.'s Br. at 16). Plaintiff, however, does not provide what exact analysis the ALJ should have provided under the Social Security Ruling regarding obesity. *See* SSR 02-1p, 2000 WL 628049 (2002). In fact, contrary to Plaintiff's argument, there is no prescribed analysis required, rather SSR 02-1p provides guidance regarding the evaluation of obesity and cautions that each case must be evaluated "based on the information in the case record." *Id.* at *3. The Sixth Circuit has explained:

> Social Security Ruling 02-1p does not mandate a particular mode of analysis. It only states that obesity, in combination with other impairments, 'may' increase the severity of the other limitations. It is a mischaracterization to suggest that SSR 02-1p offers any particular procedural mode of analysis for obese disability claimants.

*Bledsoe v. Barnhart*, 165 F. App'x 408, 411-12 (6th Cir. 2006); *see also Coldiron v. Comm'r of Soc. Sec.*, 391 F. App'x 435, 443 (6th Cir. 2010).

Here, the record is clear that the ALJ sufficiently accounted for Plaintiff's obesity where the ALJ discussed and referenced Plaintiff's obesity throughout his decision. Indeed, the ALJ referenced that he considered SSR 02-1p in his decision and further found that Plaintiff's obesity constituted a severe impairment. (Tr. 18-19). The ALJ noted that Plaintiff was 5' 8" and weighed 308 pounds at the time of the hearing.[4] (Tr. 20). The ALJ also took note of Plaintiff's

---

[4] The Court notes that Plaintiff testified she was 5' 10" at the hearing. (Tr. 35).

testimony that her weight had increased some 125 pounds since she graduated from high school and that "her weight had increased due to her impairments, specifically from not being able to exercise." (Tr. 21). The ALJ then noted that Dr. Lazzara had found that her "wide-based gait appeared to be due to her body habitus" and that she "would benefit greatly from weight reduction." (*Id.*).

Most significantly, the ALJ explicitly considered Plaintiff's obesity when deciding to only give "some weight" to the State agency medical consultant William Venema's assessment that Plaintiff could perform light work with limited ability to push/pull in the lower extremities, and postural and environmental limitations." (Tr. 22). The ALJ concluded that "when the claimant's pain is taken into consideration with the limitation in the knees and the obese state, the overall objective evidence supports work at a sedentary level". (*Id.*).

Plaintiff has also failed to set forth any explanation as to why the ALJ's residual functional capacity did not accommodate her obesity related symptoms. (Pl.'s Br. at 15-16). Indeed, the ALJ's residual functional capacity assessment of Plaintiff did accommodate Plaintiff's limitations attributed to her knee pain, obesity and other symptoms with postural limitations and a sit/stand option. (Tr. 18). Further, the Sixth Circuit has found no violation of SSR 02-1p where the ALJ relied upon physician opinions that accounted for a claimant's obesity in determining the claimant's RFC, thereby incorporating "the effect that obesity has on the claimant's ability to work into the RFC he constructed"). *Coldiron*, 391 F. App'x at 443. Here, just as in *Coldiron*, the ALJ relied upon the opinions of Schaefer, Lazzara, and to a more limited extent Hopkins and Venema, all who noted Plaintiff's obesity or discussed her obesity in their opinions. (*See* tr. 229, 247-51, 271, 277). Therefore, the Court finds that the ALJ properly

considered Plaintiff's obesity.

E.     Autumn Hopkins' November 2011 Assessment

Plaintiff argues that the ALJ failed to properly evaluate physician assistant Autumn Hopkins' assessment and "lacked substantial evidence to purportedly accept some portions of Ms. Hopkins['] opinions, while rejecting others." (Pl.'s Br. at 19). Plaintiff also argues that the ALJ failed to properly evaluate Hopkins' opinion pursuant to SSR 06-3p.

First, to the extent that Plaintiff's argument is based on her newly submitted evidence the Court declines to address such an argument as that evidence cannot be properly considered by this Court. Further, as the Court has set forth *supra*, a request for a Sentence Six remand on this evidence is rejected.

The Court also finds that the ALJ properly evaluated Hopkins' November 2011 assessment pursuant to SSR 06-3p. Hopkins is a physician's assistant and therefore her opinion is not considered "an acceptable medical source", but rather considered an "other source" opinion that can be used "to show the severity of [a claimant's] impairment(s) and how it affects [her] ability to work". 20 C.F.R. § 404.1513(d). However, the regulations provide that when evaluating such "other source" opinions an ALJ should consider the same or similar factors as when they evaluate medical source opinion, such as: how long the source has known or how frequently the source has seen the individual; how consistent the opinion is with other evidence; how well the source explains the opinion; the degree to which the source presents relevant evidence to support an opinion; and any other factor that tends to support or refute the opinion. SSR 06-3p, 2006 WL 2329939, at * 4 (Aug 9, 2006).

25

Hopkins' November 2011 medical source opinion provided extreme limitations for Plaintiff, including that she could sit for only 15 minutes at a time and for less than a total of 2 hours a day in an 8-hour work day, that Plaintiff could only walk 5 to 10 minutes at a time and stand and/or walk less than 2 hours in an 8-hour work day.  The November 2011 assessment also provided that Plaintiff required unscheduled breaks, had limited ability to perform postural activities, had limitations on reaching, handling, and fingering, and set forth that Plaintiff would be off task for 25% of a work day.  (Tr. 19, 262-66).

In the present case, despite Plaintiff's cursory argument to the contrary, the ALJ did articulate good reasons for this treatment of Hopkins' November 2011 assessment.  In fact the record makes clear that the ALJ agreed with Hopkins' assessment to the extent that it supported Plaintiff's ability to perform work at the sedentary level "with some postural and environmental limitations, and a limited sit/stand option."  (Tr. 19).  The ALJ also agreed that Plaintiff had some mental limitations that were secondary to her knee pain.  (Tr. 19-20).  The ALJ then gave "little weight" to the rest of Hopkins' assessment because it was "inconsistent" with the medical record, namely the findings of Dr. Schaefer in August 2010 and Dr. Lazzara in November 2010, as well as the objective evidence.  (Tr. 20).  Finally, the ALJ gave little weight to Hopkins' opinion, in part, because Plaintiff had not been seen by Hopkins' for an entire year prior to issuing her medical source statement and at her previous visit Hopkins had not imposed any limitations.  (*Id*.).

Therefore, the ALJ found that Hopkins' opinion was inconsistent with the medical record and also with the opinions of Drs. Lazzara and Schaefer.  Hopkins' opinion regarding Plaintiff's limitations was also undermined because she had not seen or treated Plaintiff in a year and had

26

previously imposed no limitations.  Therefore, the record is clear that the ALJ did in fact

consider the factors set forth by SSR 06-3p and provided good reasons for his holding.

Accordingly, the Court finds that the ALJ properly evaluated Hopkins' opinion and his opinion

was supported by substantial evidence.

F.      Hypothetical Provided to the Vocational Expert

Plaintiff argues that the ALJ also erred when he failed to give the VE a hypothetical that

accurately portrayed Plaintiff's limitations.  (Pl.'s Br. at 20).  Specifically, Plaintiff complains

that the ALJ did not incorporate Hopkins' opinion that Plaintiff would be "off task" for 25% of

the time.  (Tr. 265).  Plaintiff notes that the VE's testimony made clear that where a person was

off task for even 10% of the time such a limitation would be work preclusive and therefore, the

ALJ's failure to include this limitation should result in a remand.  (Tr. 69-71).

As discussed and analyzed *supra*, however, the ALJ properly evaluated and discounted

Hopkins' November 2011 opinion, including the limitation that Plaintiff be off task for 25% of

the day.  Further, the ALJ did acknowledge and account for Plaintiff's fatigue and concentration

deficits by proposing a hypothetical to the VE that incorporated this limitation.  (Tr. 18, 21).

Indeed, the ALJ's residual functional capacity assessment provides:

> Given the concentration deficits secondary to knee pain, the claimant would be
> limited to simple, routine repetitive tasks.  She is able to understand, remember
> and carry out simple work instruction, but is unable to perform more complex
> decision-making that would require creative solutions to novel situations; and is
> limited to no more than occasional changes in the work setting, in terms of work
> process and procedures.

(Tr. 18).  Therefore, Plaintiff's argument that the ALJ's hypothetical failed to take into account

Plaintiff's concentration deficits is without merit.

Moreover, because the ALJ's mental limitations provided to the VE were based on substantial evidence, the ALJ could properly rely upon the VE's testimony to find that there existed a significant number of jobs in the national economy that Plaintiff could perform. *See Varley v. Sec'y of Health & Human Servs.*, 820 F.2d 777, 779 (6th Cir. 1987) (holding "[s]ubstantial evidence may be produced through reliance on the testimony of a vocational expert in response to a hypothetical question".); *Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 516 (6th Cir. 2010) ("In order for a vocational expert's testimony in response to a hypothetical question to serve as substantial evidence in support of the conclusion that a claimant can perform other work, the question must accurately portray a claimant's physical and mental impairments."). Accordingly, the Court denies Plaintiff's argument based on the hypothetical given to the VE.

## IV. CONCLUSION

For all these reasons, the Court DENIES Plaintiff's Motion for Summary Judgment (ECF No. 16), and GRANTS Defendant Commissioner's Motion for Summary Judgment (ECF No. 20).

IT IS SO ORDERED.


                                        s/Paul D. Borman
                                        PAUL D. BORMAN
                                        UNITED STATES DISTRICT JUDGE

Dated:  May 20, 2015

28

CERTIFICATE OF SERVICE

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on May 20, 2015.

s/Deborah Tofil
Case Manager